IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
November 7, 2023 Session

**IN RE RYLEE L. ET AL.**

**Appeal from the Juvenile Court for Warren County**
**No. JV2794      Brandon J. Cox, Judge**

_____

**No. M2023-00487-COA-R3-PT**

_____

In the course of two separate dependency and neglect proceedings, a mother and father were found to have committed severe child abuse on their two children. In this termination proceeding, the trial court found that the grounds for termination of (1) severe child abuse, and (2) failure to manifest an ability and willingness to personally assume custody or financial responsibility of the children had been proven and that it was in the children's best interest to terminate their parents' parental rights. The parents appealed. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**

ANDY D. BENNETT, J., delivered the opinion of the Court, in which W. NEAL MCBRAYER and JEFFREY USMAN, JJ., joined.

Walter Alan Rose, Tullahoma, Tennessee, for the appellants, Cassie L. and Austin L.

Jonathan Skrmetti, Attorney General and Reporter, and Jordan Keith Crews, Senior Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

**OPINION**

Cassie L. ("Mother") and Austin L. ("Father") (collectively "the appellants") are married and are the biological parents of Rylee L. (born in 2019) and Stormy L. (born in 2021). On August 2, 2020, Father was involved in a single-car accident. Blood taken from Father at the scene of the accident tested positive for methamphetamine, fentanyl, amphetamine, and ketamine. As a result, police arrested Father and charged him with driving under the influence, and the Department of Children's Services ("the Department" or "DCS") received a report that Rylee was a drug-exposed child.

On August 7, 2020, DCS filed a petition alleging that Rylee was dependent and neglected and requesting that she be placed in the sole custody of Mother. That same day, the juvenile court entered an order placing Rylee in Mother's sole custody subject to a protective supervision plan that required Mother to maintain regular contact with DCS, comply with random drug screens, complete anger management and individual therapy, submit to a parenting assessment and follow all resulting recommendations, and obtain and maintain safe and stable housing. When Mother failed to comply with the August 7 order, the court entered an order on October 12, 2020, placing Rylee in DCS custody. Two days later, Mother and Rylee submitted to hair follicle drug screens, and both returned positive for methamphetamine, hydrocodone, and oxycodone. On July 2, 2021, the trial court entered an order adjudicating Rylee dependent and neglected and finding that she was the victim of severe child abuse perpetrated by Mother and Father. Neither parent appealed this order.

Mother became pregnant with Stormy while the dependency and neglect proceedings for Rylee were pending. During the third month of the pregnancy, Mother and Father submitted to hair follicle drug screens. Mother's screen returned positive for methamphetamine, and Father's returned positive for methamphetamine, hydrocodone, and oxycodone. A little over a month before Stormy was born, both parents again submitted to hair follicle drug screens. This time both parents were positive for methamphetamine, hydrocodone, and oxycodone. Thus, when Stormy was born, DCS received a report alleging that she had been exposed to drugs.

The Department filed a petition alleging that Stormy was dependent and neglected and requesting that she be placed in DCS custody. The court entered an order on December 31, 2021, placing Stormy in DCS custody. On May 23, 2022, the trial court entered an order adjudicating Stormy dependent and neglected and finding that she was a victim of severe child abuse perpetrated by Mother and Father. Neither parent appealed this order.

During the custodial period, DCS created four permanency plans for Mother and Father that were all ratified by the court. The plans' requirements included the following: submit to random drug screens; complete an alcohol and drug assessment and follow the recommendations; refrain from abusing prescription medications and alcohol; complete domestic violence classes; complete a psychological evaluation and follow the recommendations; complete a parenting assessment and parenting classes; obtain and maintain suitable housing; allow DCS to conduct home visits; obtain and provide proof of legal means of income; maintain contact with DCS; attend scheduled visits with the children; and attend anger management classes.

The Department attempted to help the parents complete the requirements of the permanency plans. Nevertheless, Mother and Father completed very little. Most importantly, Mother and Father did not comply with the requirements relating to their substance abuse issues. Both refused to submit to several drug screens for DCS, and they

failed several of the ones to which they did submit. Mother and Father both completed an alcohol and drug assessment early on in the custodial period, but DCS required them both to complete a second alcohol and drug assessment when they continued failing drug screens. Neither completed a second alcohol and drug assessment. Father was required to submit to drug screens for the Recovery Court program he was in, and he passed the drug screens administered through that program. Those drug screens, however, did not include a test for methamphetamine like the ones administered by DCS, which Father failed.

On October 20, 2022, DCS filed a petition to terminate Mother's and Father's parental rights. After a one-day trial, the trial court entered an order terminating Mother's and Father's parental rights on the grounds of severe child abuse and failure to manifest an ability and willingness to personally assume custody or financial responsibility of the children. In the order, the court further determined that termination of Mother's and Father's parental rights was in the best interest of the children.

STANDARD OF REVIEW

A parent has a fundamental right to the care, custody, and control of his or her child. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010) (citing *Troxel v. Granville*, 530 U.S. 57, 65 (2000)); *Nash-Putnam v. McCloud*, 921 S.W.2d 170, 174-75 (Tenn. 1996) (citing *Nale v. Robertson*, 871 S.W.2d 674, 678 (Tenn. 1994)). This right is not absolute. *In re Angela E.*, 303 S.W.3d at 250. The Tennessee General Assembly has, by statute, established "'those situations in which the state's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth grounds on which termination proceedings can be brought.'" *In re Jacobe M.J.*, 434 S.W.3d 565, 568 (Tenn. Ct. App. 2013) (quoting *In re W.B., IV.*, Nos. M2004-00999-COA-R3-PT, M2004-01572-COA-R3-PT, 2005 WL 1021618, at *7 (Tenn. Ct. App. Apr. 29, 2005)).

Tennessee Code Annotated section 36-1-113 establishes the grounds and proceedings by which parental rights may be terminated. Initially, a petitioner must prove that at least one termination ground exists. Tenn. Code Ann. § 36-1-113(c)(1); *In re Angela E.*, 303 S.W.3d at 251. The petitioner must then prove that it is in the child's best interest to terminate the parents' rights. Tenn. Code Ann. § 36-1-113(c)(2); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). "In light of the interests and consequences at stake, parents are constitutionally entitled to fundamentally fair procedures [] in termination proceedings." *In re Carrington H.*, 483 S.W.3d 507, 522 (Tenn. 2016) (citing *Santosky v. Kramer*, 455 U.S. 745, 754 (1982)).

As our Supreme Court has stated:

> Among the constitutionally mandated fundamentally fair procedures[]
> is a heightened standard of proof—clear and convincing evidence. *Santosky*,

455 U.S. at 769, 102 S.Ct. 1388. This standard minimizes the risk of unnecessary or erroneous governmental interference with fundamental parental rights. *Id*.; *In re Bernard T*., 319 S.W.3d 586, 596 (Tenn. 2010). Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T*., 319 S.W.3d at 596 (citations omitted). The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not. *In re Audrey S*., 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re M.A.R*., 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005).

*Id.* Thus, on appeal, we apply the following principles:

An appellate court reviews a trial court's findings of fact in termination proceedings using the standard of review in Tenn. R. App. P. 13(d). *In re Bernard T*., 319 S.W.3d at 596; *In re Angela E*., 303 S.W.3d at 246. Under Rule 13(d), appellate courts review factual findings de novo on the record and accord these findings a presumption of correctness unless the evidence preponderates otherwise. *In re Bernard T*., 319 S.W.3d at 596; *In re M.L.P*., 281 S.W.3d 387, 393 (Tenn. 2009); *In re Adoption of A.M.H*., 215 S.W.3d 793, 809 (Tenn. 2007). In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. *In re Bernard T*., 319 S.W.3d at 596-97. The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. *In re M.L.P*., 281 S.W.3d at 393 (quoting *In re Adoption of A.M.H*., 215 S.W.3d at 810). Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness. *In re Angela E*., 303 S.W.3d at 246.

*Id.* at 523-24.

## ANALYSIS

I. Termination grounds.

In their brief, the appellants state that they "do not dispute the grounds for termination of their parental rights. . . ." Indeed, they did not raise as error the determination that grounds for termination exist. Instead, they argued that the children's best interest does

not require termination of Mother's and Father's parental rights. Yet, "in an appeal from an order terminating parental rights the Court of Appeals must review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests, regardless of whether the parent challenges these findings on appeal." *Id.* at 525-26. The appellants' attorney knew of this requirement; he cited the *Carrington* case in his brief. He did not, however, seek to aid this court by bestowing upon us his thoughts about the grounds beyond saying they were not contested.[1] Failing to raise an issue in the listing of issues in an appellate brief would ordinarily be considered a waiver of the issue. *See Augustin v. Bradley Cnty. Sheriff's Off.*, 598 S.W.3d 220, 226 (Tenn. Ct. App. 2019) (stating that "issues that are not properly designated are generally waived even when argued in the body of the brief"); *see also Newcomb v. Kohler Co.*, 222 S.W.3d 368, 401 (Tenn. Ct. App. 2006) (noting that a party's failure "to cite to any authority or to construct an argument regarding [a] position on appeal constitutes waiver of that issue"). Under the requirements of *Carrington*, though, we must dive into the cold words of the record to ascertain the validity of the grounds.

*Severe Child Abuse*

The trial court terminated both parents' parental rights pursuant to Tenn. Code Ann. § 36-1-113(g)(4), which states that a parent's rights may be terminated when:

> The parent . . . *has been found to have committed severe child abuse, as defined in § 37-1-102, under any prior order of a court* or is found by the court hearing the petition to terminate parental rights or the petition for adoption to have committed severe child abuse against any child[.]

(Emphasis added). Thus, a petitioner may establish this ground by showing that the parent was found to have committed severe child abuse in "any prior order of a court." Nothing more need be proved.

"Dependency and neglect proceedings are separate and distinct from proceedings to terminate parental rights." *In re Carrington H.*, 483 S.W.3d at 536. We have "repeatedly applied the doctrine of res judicata to prevent a parent from re-litigating whether he or she committed severe child abuse in a termination of parental rights proceeding when such a finding has already been made in a previous dependency and neglect action." *In re Kylea K.*, No. E2017-02097-COA-R3-PT, 2018 WL 3084530, at *4 (Tenn. Ct. App. June 21, 2018); *see also, e.g.*, *In re Dakota C.R.*, 404 S.W.3d 484, 497 (Tenn. Ct. App. 2012); *In re Heaven L.F.*, 311 S.W.3d 435, 439 (Tenn. Ct. App. Feb. 19, 2010). Pursuant to the doctrine of res judicata, "'an existing final judgment rendered upon the merits, without fraud or

---

[1] We commend the attorneys for the Department of Children's Services for noting *Carrington* and addressing the grounds for termination in their brief.

collusion, by a court of competent jurisdiction, is conclusive of the rights, questions and facts in issue as to the parties and their privies, in all other actions in the fraud or collusion, by a court of competent jurisdiction, is conclusive of the rights, questions and facts in issue as to the parties and their privies, in all other actions in the same or any other judicial tribunal of concurrent jurisdiction.'" *In re Heaven L.F.*, 311 S.W.3d at 439 (quoting *Galbreath v. Harris*, 811 S.W.2d 88, 90 (Tenn. Ct. App. 1990)).

All the requirements of res judicata are met in this case. In the Warren County Juvenile Court's July 1, 2021 order adjudicating Rylee dependent and neglected, the court found that both parents committed severe child abuse on Rylee[2] under Tenn. Code Ann. § 37-1-102(b)(27)(E) ("Knowingly or with gross negligence allowing a child under eight (8) years of age to ingest an illegal substance or a controlled substance that results in the child testing positive on a drug screen, except as legally prescribed to the child[.]"). Similarly, in the Warren County Juvenile Court's May 24, 2022 order adjudicating Stormy dependent and neglected, the court found that both parents committed severe child abuse on Stormy under Tenn. Code Ann. § 37-1-102(b)(27)(E). Neither order has been appealed. The orders are final.

We affirm the termination of both parents' parental rights based on the ground of severe child abuse.

### *Failure to Manifest an Ability and Willingness to Personally Assume Custody or Financial Responsibility of the Children*

Under Tenn. Code Ann. § 36-1-113(g)(14), parental rights may be terminated when:

> A parent or guardian has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[.]

"If a person seeking to terminate parental rights proves by clear and convincing proof that a parent or guardian has failed to manifest either ability or willingness, then the first prong of the statute is satisfied." *In re Neveah M.*, 614 S.W.3d 659, 677 (Tenn. 2020) (emphasis in original). Here, DCS showed that ability and willingness was lacking in both parents. Neither parent could remain consistently employed. Both Mother and Father have thwarted most of the Department's efforts to inspect their home, but the one inspection they permitted did not reveal a home that was safe, clean, and ready for two young children. Rather, the home was "noticeably dirty," with boxes of "stuff" laying around, and food on the kitchen counter. One could see through the kitchen floor in places, and "[y]ou could

---

[2] The order mistakenly spells her name "Riley."

- 6 -

practically fall through it" in other spots.  Both parents failed to cooperate with drug tests, and the proof gives this Court little confidence that they have overcome their addictions. Mother even failed a drug screen two months before trial.

These facts also support a finding that neither parent has manifested a willingness to assume custody or financial responsibility for the children, a finding that requires concrete actions, not mere words. Furthermore, over two years after DCS took custody of Rylee, both parents are nowhere near completing their permanency plan tasks. Father is farther along than Mother, but his efforts are recent. These parents have not shown any real interest in the children. They have not inquired about the children or their needs. The parents' attendance at scheduled visitations was poor. Mother was late for approximately 20 visits, on time for approximately 6, and missed approximately 14.  Father was late for 20 visits, on time for approximately 8, and missed approximately 12. Neither parent has made more than token payments for child support unless compelled by jail placement or IRS intercept.

As for the second prong of Tenn. Code Ann. § 36-1-113(g)(14), "placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child," the DCS social worker testified that Mother had not maintained sobriety and that "the department cannot see sobriety" in Father. The social worker also noted the parents' failures to complete the requirements of their permanency plans. These facts establish a situation where there was a risk of substantial harm.

We affirm the termination of both parents' parental rights based on the ground of failure to manifest an ability and willingness to personally assume custody or financial responsibility of the children.

II. Best Interest of the Children

When examining the best interest of the children in the termination of parental rights context, we are directed by statute to consider the nonexclusive factors listed in Tenn. Code Ann. § 36-1-113(i)(1). The statute enumerates factors that the court "shall consider," *In re Angela E.*, 303 S.W.3d at 251, but a court is not required to find that each of the enumerated factors exists before concluding that it is in the best interest of the child to terminate a parent's rights. *In re M.A.R.*, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005). The statute similarly does not call for a mechanical determination of each of the statute's factors, but rather the relevancy and weight of each factor will be unique to each case. *In re Marr*, 194 S.W.3d 490, 499 (Tenn. Ct. App. 2005). Therefore, in certain circumstances, the consideration of one factor may be determinative. *Id.* (citing *In re Audrey S.*, 182 S.W.3d 838, 878 (Tenn. Ct. App. 2005)). However, this does not relieve a court of its duty to consider each factor and, even in cases where one factor is outcome determinative, the

court must consider all factors and relevant proof that a party offers. *In re Gabriella D.*, 531 S.W.3d 662, 682 (Tenn. 2017).

In the best interest analysis, the facts considered must be proven by "'a preponderance of the evidence, not by clear and convincing evidence.'" *Id.* at 681 (quoting *In re Kaliyah S.*, 455 S.W.3d 553, 555 (Tenn. 2015)). "'After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest[s].'" *Id.* (quoting *In re Kaliyah S.*, 455 S.W.3d at 555). We will examine each factor in turn.

Factor A concerns "[t]he effect a termination of parental rights will have on the child's critical need for stability and continuity of placement throughout the child's minority." Tenn. Code Ann. § 36-1-113(i)(1)(A). Rylee has flourished in the pre-adoptive foster home. Stormy has never lived with her parents. They live in a safe and stable environment.

Factor B considers "[t]he effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological, and medical condition." *Id.* 36-1-113(i)(1)(B). The social worker testified that Rylee would backslide after seeing her parents and told of a highly negative reaction Rylee had when she thought she was going to see her parents. The social worker testified that a change in caretakers would also be detrimental to Stormy, who has never lived with her parents and is bonded with the foster parents. Furthermore, Stormy has several medical conditions that require treatment and vigilance. Neither parent has shown an interest in her condition.

Next, under Factors C and D, neither parent knows the needs of the children. As the social worker testified, a bond "just does not exist," and she did not believe it would develop. *See id.* 36-1-113(i)(1)(C), (D) ("Whether the parent has demonstrated continuity and stability in meeting the child's basic material, educational, housing, and safety needs;" and "[w]hether the parent and child have a secure and healthy parental attachment, and if not, whether there is a reasonable expectation that the parent can create such attachment.").

Factor E regards "[w]hether the parent has maintained regular visitation or other contact with the child and used the visitation or other contact to cultivate a positive relationship with the child." *Id.* § 36-1-113(i)(1)(E). As noted previously, the parents had poor attendance at scheduled visitations. Mother was late for approximately 20 visits, on time for approximately 6, and missed approximately 14. Father was late for 20 visits, on time for approximately 8, and missed approximately 12. There were some visits where the children were upset. At least one visit ended early because the parents could not handle Stormy.

Factor F considers "[w]hether the child is fearful of living in the parent's home." *Id.* § 36-1-113(i)(1)(F). The record contains no evidence regarding this factor.

Next, Factor G looks at "[w]hether the parent, parent's home, or others in the parent's household trigger or exacerbate the child's experience of trauma or post-traumatic symptoms." *Id.* § 36-1-113(i)(1)(G). The social worker believed that putting Rylee back in the home from which she was removed "would create a trauma trigger for her."

Factor H concerns "[w]hether the child has created a healthy parental attachment with another person or persons in the absence of the parent." *Id.* § 36-1-113(i)(1)(H). The social worker testified that Rylee had a very strong parental attachment to her foster parents, and Rylee refers to them as Mommy and Daddy. Foster mother testified that "we do everything as a family together. We're a unit." Stormy is also bonded with the foster parents and to Rylee.

Factor I considers "[w]hether the child has emotionally significant relationships with persons other than parents and caregivers, including biological or foster siblings, and the likely impact of various available outcomes on these relationships and the child's access to information about the child's heritage." *Id.* § 36-1-113(i)(1)(I). Rylee enjoys ballet. She has many friends at church and daycare, and she has lots of cousins who are also friends. She has two sets of grandparents who love her. Rylee and Stormy are closely bonded. Stormy is also close to members of foster mother's family.

Next, under Factor J, we consider "[w]hether the parent has demonstrated such a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the child to be in the home of the parent, including consideration of whether there is criminal activity in the home or by the parent, or the use of alcohol, controlled substances, or controlled substance analogues which may render the parent unable to consistently care for the child in a safe and stable manner." *Id.* § 36-1-113(i)(1)(J). Neither parent has demonstrated a lasting adjustment, and they have completed few of the requirements of their permanency plans. Instead, they have mostly been uncooperative. On October 27, 2021, Father pled guilty to driving on a revoked driver's license, first offense, and to violating the financial responsibility law. Mother failed a drug screen two months before trial.

Factor K concerns "[w]hether the parent has taken advantage of available programs, services, or community resources to assist in making a lasting adjustment of circumstances, conduct, or conditions." *Id.* § 36-1-113(i)(1)(K). As noted, neither parent has completed the requirements of the permanency plans. They were offered a number of ways to receive various assessments. Mother completed virtually none and lied on the one she did complete. Father has gone through the drug court program, but he has not completed the requirements of the permanency plans.

Next, Factor L looks at "[w]hether the department has made reasonable efforts to assist the parent in making a lasting adjustment in cases where the child is in the custody of the department." *Id.* § 36-1-113(i)(1)(L). The Department created permanency plans, administered drug screens, arranged supervised visits for the parents, gave the parents contact information for various providers. and obtained funding for some examinations.

Factor M concerns "[w]hether the parent has demonstrated a sense of urgency in establishing paternity of the child, seeking custody of the child, or addressing the circumstance, conduct, or conditions that made an award of custody unsafe and not in the child's best interest." *Id.* § 36-1-113(i)(1)(M). Neither parent has demonstrated a sense of urgency. They have completed little to none of the requirements of the permanency plans, and the social worker testified that they are basically back to square one on them.

Factor N pertains to "[w]hether the parent, or other person residing with or frequenting the home of the parent, has shown brutality or physical, sexual, emotional, or psychological abuse or neglect toward the child or any other child or adult." *Id.* § 36-1-113(i)(1)(N). The juvenile court found that both parents perpetrated severe child abuse on both children.

Factor O considers "[w]hether the parent has ever provided safe and stable care for the child or any other child." *Id.* § 36-1-113(i)(1)(O). By court order, Stormy was removed from her parents' custody the day after she was born. During Mother's pregnancy with Stormy, Mother and Father failed two drug tests. When Rylee was almost a year old, she failed a drug test. Exposure to drugs is not part of a safe or stable environment.

Factor P looks at "[w]hether the parent has demonstrated an understanding of the basic and specific needs required for the child to thrive." *Id.* § 36-1-113(i)(1)(P). The social worker testified that the parents had "a lack of interest in the children and what their needs are throughout the 28 months of this case." Neither parent ever reached out to the social worker, even once, to check on the children. Moreover, the parents have not demonstrated an understanding of Stormy's unique medical conditions that require special care and vigilance.

Factor Q considers "[w]hether the parent has demonstrated the ability and commitment to creating and maintaining a home that meets the child's basic and specific needs and in which the child can thrive." *Id.* § 36-1-113(i)(1)(Q). The one home inspection permitted showed the home to be dirty and dangerous. The social worker has not been allowed inside since that inspection. The parents have not followed the permanency plans and have not taken the required parenting classes.

Factor R considers "[w]hether the physical environment of the parent's home is healthy and safe for the child." *Id.* § 36-1-113(i)(1)(R). A dirty home with holes in the floors is neither healthy nor safe.

As to Factors S and T, the parents occasionally made token payments, but the only significant payments were due to incarceration for failure to pay child support and an IRS intercept. Lastly, both parents told the social worker that they were depressed and stated that their drug usage was linked to their mental health. Absent appropriate treatment, no reason has been offered in the record that anything would change. *See id.* § 36-1-113(i)(1)(S), (T) ("Whether the parent has consistently provided more than token financial support for the child," and "[w]hether the mental or emotional fitness of the parent would be detrimental to the child or prevent the parent from consistently and effectively providing safe and stable care and supervision of the child.").

During oral argument, the parents' attorney made a rather strident argument that drug addicted parents need more time to make the changes necessary to regain custody of their children. The best interest analysis, however, is intended to ascertain the best interest of the children, not the parents. Furthermore, "the prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest." *Id.* § 36-1-113(i)(2). No proof in the record rebuts this statutory presumption.

We agree with the trial court that clear and convincing evidence supports the determination that termination of the parents' parental rights is in the best interest of Rylee and Stormy.

CONCLUSION

The judgment of the trial court is affirmed. Costs of this appeal are assessed against the appellants, Austin L. and Cassie L., for which execution may issue if necessary.

_/s/ Andy D. Bennett_____
ANDY D. BENNETT, JUDGE